COURT OF APPEALS
DECISION
DATED AND FILED

June 25, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2025AP1073-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2022CF666

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

KEWANE D.L. SPENCE,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Rock County: KARL HANSON, Judge. *Affirmed*.

Before Kloppenburg, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Kewane D.L. Spence appeals a judgment convicting him of three counts of first-degree recklessly endangering safety and a postconviction order denying his motion for a new trial. Spence argues that he is entitled to a new trial based on his assertion that the prosecutor elicited false testimony and improperly emphasized that testimony in closing argument. We conclude that Spence is not entitled to a new trial and affirm the judgment and order.

## BACKGROUND

¶2    The following facts are undisputed. Officers with the Beloit Police Department were dispatched to investigate reports of gunfire. Officer Colin Hirsch interviewed a witness, referred to in this opinion as A.B., who was a passenger in the car that was struck by a bullet during the shooting. A.B. showed Officer Hirsch a photograph of Spence and identified Spence as the shooter. Officer Michael Doran interviewed Spence.

¶3    The State charged Spence with three counts of first-degree recklessly endangering safety and one count of felon in possession of a firearm. The case proceeded to a jury trial. At trial, the jury heard testimony from A.B., A.B.'s mother, who was also a passenger in the car that was struck by a bullet (referred to in this opinion as C.D.), Officer Hirsch, Officer Doran, and several other officers with the Beloit Police Department. Pertinent here, Doran testified at length about a recorded interview that he conducted with Spence. In the course of that testimony, Doran testified that he had found Facebook messages from the day before the shooting in which Spence told someone that he was at "Star['s] house," and that Doran had learned that the shooting occurred behind the house where Rastar Shipp lived. When Doran asked if Spence knew someone with the last

2

name "Shipp" or the first name "Rastar," Spence denied knowing such a person; however, after further questioning, Spence admitted to knowing "Star." In closing arguments, the prosecutor referenced several times these aspects of Spence's interview to impugn Spence's credibility and show that Spence was lying to cover up that he was the shooter.

¶4     The jury found Spence guilty of three counts of first-degree recklessly endangering safety and one count of possession of a firearm by a felon. Spence filed a postconviction motion for a new trial alleging prosecutorial misconduct and ineffective assistance of trial counsel.[1] As relevant to this appeal, Spence argued that Officer Doran's testimony substantially misrepresented Spence's answers to Doran's questions with respect to whether he knew Rastar Shipp, and that the prosecutor committed misconduct by eliciting that false testimony from Doran, by not taking steps to correct the false testimony, and by exaggerating the false testimony in closing argument. After a hearing on the motion, the circuit court concluded that "there is not a reasonable likelihood that those misstatements, if they are such, affected the jury's decision in light of the strong identification and circumstantial evidence otherwise presented at trial and argued in closing by the parties." The court denied Spence's motion for a new trial. Spence appeals.

## DISCUSSION

¶5     Spence argues that prosecutorial misconduct violated his due process rights and entitles him to a new trial. Because at trial Spence neither objected to

---

[1] Spence does not renew his argument as to ineffective assistance of counsel on appeal, and accordingly we do not address the issue in this opinion.

the prosecutor's alleged misconduct nor moved for a mistrial, he has forfeited this argument. *See State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 (stating that "some rights are forfeited when they are not claimed at trial; a mere failure to object constitutes a forfeiture of the right on appellate review"). However, Spence argues that he is nonetheless entitled to a new trial because the prosecutor's alleged misconduct amounts to plain error. In the alternative, Spence argues that the prosecutor's alleged misconduct entitles him to a new trial in the interest of justice.

¶6 The plain error doctrine is recognized in WIS. STAT. § 901.03(4) (2023-24),[2] and allows appellate courts to review errors that are otherwise forfeited by a party's failure to object or otherwise preserve the error for review as a matter of right. *State v. Mayo*, 2007 WI 78, ¶¶27-29, 301 Wis. 2d 642, 734 N.W.2d 115. There is no bright-line rule for what kind of error constitutes plain error. *Id.*, ¶29. Instead, "the existence of plain error will turn on the facts of the particular case." *Id.* In reviewing the facts, this court pays particular attention to "the quantum of evidence properly admitted and the seriousness of the error involved." *Id.* Wisconsin courts "should use the plain error doctrine sparingly." *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77.

¶7 "If the defendant shows that the unobjected to error is fundamental, obvious, and substantial, the burden then shifts to the State to show the error was harmless." *Id.*, ¶23. An error is harmless if, based on the totality of the circumstances, the State can prove "'beyond a reasonable doubt that a rational jury

---

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

would have found the defendant guilty absent the error[.]'" *Mayo*, 301 Wis. 2d 642, ¶47 (quoted source omitted).

¶8 Spence argues that he has established plain error based on his assertions of prosecutorial misconduct. Specifically, Spence argues that the prosecutor knowingly elicited false testimony about Spence's denying knowing Rastar Shipp and knowingly mischaracterized Spence's statements to Officer Doran as an indication that Spence initially lied to Officer Doran about whether Spence knew Rastar Shipp. He asserts that the characterization was misleading, significantly misrepresented the evidence, and portrayed Spence as "convoluted" and "wacky" in an attempt to imply fabrication and impugn Spence's credibility. Even if the prosecutor's alleged misconduct constitutes an error and that error is plain, we conclude that, when looking at the totality of the circumstances, any error was harmless because it is clear beyond a reasonable doubt that a rational jury would have found Spence guilty absent the error. We now turn to the evidence presented at trial that supports this conclusion.

¶9 Officer Hirsch testified at trial. On the day of the shooting, Hirsch interviewed A.B. and C.D., both of whom were in the car that was struck by a bullet, about the shooting. Hirsch had his body camera on during his time with A.B. and C.D., and the State played the body camera footage for the jury. Hirsch testified, consistent with what the footage showed, that A.B. showed Hirsch a photograph of Spence and told Hirsch that she was 100 percent sure that the person in the photograph was the person who had shot at her. Hirsch testified that both A.B. and C.D. told Hirsch that they did not want to report this incident because C.D.

> had had a past experience where her friend had been a
> victim of a shooting and had suffered some retaliation

> instances because she came to the police and talked about it and the names were released in the newspaper. I don't know where that was, so they were initially apprehensive to speak with officers and make a statement out of fear of some sort of retaliation.

Hirsch also testified that he and several other officers searched the scene of the shooting and found two fired 9mm cartridge casings stamped with "SIG 9mm Luger."

¶10 In addition to Officer Doran's testimony regarding his interview with Spence, Doran testified that he found Facebook messages on Spence's phone from a few days after the shooting in which Spence asked someone if they wanted to buy a "pipe." Doran testified that "pipe" is a common street term for a gun.

¶11 Officer Doran further testified as follows. Spence told Doran that Spence drove a car owned by a woman with the surname Davis, with whom Spence was in a dating relationship. Doran found messages in Davis's phone in which Spence discussed with Davis that Spence had left his firearm in the car. After Davis gave law enforcement consent to search the car, Doran found in the car's trunk identification cards belonging to Spence, mail addressed to Spence, and keys. One of the keys was for a gun safe that was kept in a storage unit, and Davis gave law enforcement consent to search the storage unit. Davis told law enforcement that the storage unit contained items from a residence from which Davis and Spence had just moved out. In the gun safe, Doran found a 9mm handgun magazine containing one unfired bullet and 33 rounds of unfired SIG 9mm Luger ammunition.

¶12 Officer Ryan Kelly testified that he aided in the investigation of the shooting. Kelly testified that the purpose of the search of the storage unit was to locate a firearm that Davis said that she owned and that was in the storage unit.

Kelly also testified that law enforcement located 9mm ammunition in the storage unit but did not find a 9mm firearm.

¶13 Officer Victoria Bailey testified as follows. About four months after the shooting incident, Bailey presented a photo lineup to A.B. Bailey explained to the jury the best practices for the proper presentation of a photo lineup and the process by which she administered the photo lineup to A.B. The photo lineup that Bailey presented to A.B. contained an array of six photographs and two blank pages. In the first round of presenting the array to A.B., A.B. identified the third photograph as being a photograph of the shooting suspect. The third photograph in the array was a photograph of Spence. A.B. told Bailey: "I think it looks like him. I've seen his -- I have his -- I've had his profile picture and he was like snarling." Bailey asked "Does this look like it might be him?" and A.B. responded "Kind of, yeah." Bailey asked A.B. how sure she was, and A.B. said "I feel like he had more facial hair. That's the only thing." After Bailey presented the photo array to A.B. a second time, A.B. again identified the third photograph as a photograph of the shooting suspect. Bailey asked A.B. her level of certainty as to the identification on a scale from one to ten. A.B. said nine. Bailey wrote on the back of the photograph "Yes. Nine out of ten. May have had more facial hair."

¶14 A.B. testified at trial as follows. On the day of the shooting, A.B. and C.D. drove to pick up A.B.'s cousin, referred to in this opinion as E.F., from a friend's house. Upon arriving at E.F.'s location, A.B. exited the vehicle and saw people arguing with E.F. in an alleyway. A.B. also observed a person holding a gun. After the person raised the gun, a number of people, including A.B. and E.F., jumped into the vehicle with C.D. As they drove away, A.B. heard something hit the back of the car. After leaving the scene, A.B. and C.D. exited the vehicle, and

7

A.B. saw a bullet hole in the vehicle. Multiple individuals called the police. On the same day of the shooting, A.B. showed an officer a Facebook photo that one of her mom's friends had sent to her. A.B. had a conversation with her mom's friend, and that conversation had had an effect on her belief as to who the shooter was. A.B. did not remember whether she identified Spence as the shooter to Officer Doran. The following exchange occurred while A.B. testified:

> [Prosecutor]: At the time that you showed this [photo] to the officer, do you recall telling him that the person in this photo was the shooter [with] 100 percent certainty?
>
> [A.B.]: I recall telling them that that's the photo I was shown. Like them telling me that's who it was. That's who I believed it was. I wasn't 100 percent sure.
>
> [Prosecutor]: You don't remember telling the officer that you were 100 percent sure?
>
> [A.B.]: (No response.)
>
> [The Court]: You have to answer --
>
> [A.B.]: No, I'm sorry.

A.B. told investigating officers that she hoped that her name would not be disclosed in a police report. A.B. did not remember whether she identified Spence as the shooter in the photo array. When defense counsel asked A.B. why she identified Spence as the shooter, she testified, "Well, I mean everybody around me believed that it was so I said it might have been. I didn't say it was."

¶15 C.D. testified as follows. C.D. and A.B. went to pick up E.F. from a location on 10th Street in Beloit. A.B. exited the vehicle to find and retrieve E.F., and C.D. stayed in the car. After A.B. and E.F. returned to her car, shots were fired, a bullet hit the car, and A.B., C.D., and E.F. drove away from the area. When later speaking to law enforcement, C.D. was scared about the shooting and asked officers to not put her or A.B.'s name in the police reports. C.D. was also

8

mad at law enforcement because it took them about five hours after the shooting to come discuss the matter with her.

¶16    In the State's closing argument, in addition to commenting on Officer Doran's interview with Spence, the prosecutor emphasized that, after the shooting, Spence had communicated with Davis about the gun in the car. The prosecutor recounted the evidence that Spence had tried to sell a gun in the days after the shooting. The prosecutor also recounted that law enforcement found Spence's identification, mail addressed to Spence, and keys to a gun safe in the trunk of a car used by Spence, and that, in searching the storage unit where the gun safe was kept, law enforcement found SIG 9mm Luger ammunition of the same type they found at the scene of the shooting and a magazine for a 9mm handgun, but no gun.

¶17    The prosecutor also emphasized in closing argument that the jury reviewed body camera footage of Officer Hirsch's interview of A.B. in which A.B. confirmed multiple times that she was 100 percent sure that Spence was the shooter. The prosecutor also discussed testimony from Officer Bailey, who testified that A.B. had identified Spence in a photo lineup and that A.B. had stated that her certainty was a nine out of ten that the photograph she chose was a photograph of the shooter.

¶18    In sum, we conclude that any error by the prosecutor was harmless because the State's overall case was strong and did not rise or fall on the fact of Spence's truthfulness, during his interview with Officer Doran, as to knowing the individual who resided at the home behind which the shooting occurred.

¶19    Spence asserts that the "weaknesses" in A.B.'s testimony are crucial in illustrating that prosecutorial misconduct affected the verdict. He specifically

9

points to A.B.'s testimony that her mother's friend influenced who she believed the shooter was, and her testimony that she told an officer that Spence was the shooter because everyone around her believed that he was. However, the record illustrates that A.B. was a key witness and identified Spence as the shooter when talking with both Officer Hirsch and Officer Bailey. In the course of A.B.'s testimony, the jury had the opportunity to observe A.B.'s demeanor and assess her credibility, and heard from A.B. regarding her desire to not have her name publicly associated with the case. The jury also had the opportunity to compare A.B.'s demeanor and testimony on the day of trial with what they observed in the audiovisual recording of Officer Hirsch's interview with A.B., which was recorded on the day of the shooting, and in which A.B. asserts that she is 100 percent positive that Spence was the shooter. While A.B. did not acknowledge these identifications in her trial testimony, she agreed that her memory would have been fresher at the time of the incident and when she spoke to police, as opposed to what it would be at the trial, which took place several months after the incident. The jury also heard evidence from Officer Hirsch that both A.B. and her mother did not want to participate in the case for fear of retaliation. Accordingly, we are not convinced that the evidence from A.B. at trial was weak. Rather, under the totality of the circumstances, a rational jury could conclude that fear of retaliation affected the difference between A.B.'s identification statements and demeanor before the trial, and her statements and demeanor while publicly testifying at Spence's trial.

¶20 Moreover, the jury heard other pieces of evidence that supported A.B.'s identification of Spence as the shooter. For example, the jury heard testimony that police found a message in which Spence discussed leaving a gun in a car he had control over, and that the police found evidence of Spence trying to

sell a gun. Additionally, when police searched a storage locker to which Spence had access, they found ammunition of the same type that they found at the scene of the shooting and a magazine for a 9mm handgun, but no gun. In light of the strong identifications from A.B. and the circumstantial evidence otherwise presented at trial, we are convinced beyond a reasonable doubt that the jury would have found Spence guilty absent the prosecutor's misconduct alleged by Spence.

¶21 Before concluding, we address two additional arguments made by Spence.

¶22 First, Spence argues that a new trial is warranted pursuant to WIS. STAT. § 752.35 because there has been a miscarriage of justice. Under § 752.35, discretionary reversal is warranted where "the real controversy has not been fully tried" or when "there has been a miscarriage of justice." *Vollmer v. Luety*, 156 Wis. 2d 1, 19-22, 456 N.W.2d 797 (1990). In cases in which a party alleges that the real controversy has not been fully tried, "it is unnecessary for an appellate court to first conclude that the outcome would be different on retrial." *Id.* at 19. In contrast, in cases in which a party alleges that there has been a miscarriage of justice, "an appellate court must first make a finding of substantial probability of a different result on retrial." *Id.* Accordingly, Spence's argument that discretionary reversal is appropriate on the basis that "there has been a miscarriage of justice" fails because, as we have explained above, it is clear beyond a reasonable doubt

11

that a rational jury would have found Spence guilty absent the alleged prosecutorial misconduct.[3]

¶23     Second, Spence argues that the circuit court erroneously exercised its discretion because the court did not support its "discretionary decision" with a "reasoned application of the relevant facts to the proper standard." Spence's argument on this matter is generally hard to understand. It appears that Spence is asserting that the court's denial of Spence's motion for a new trial is the discretionary decision to which he refers. However, Spence does not develop an argument with support from legal authority as to how the court's denial of the motion for a new trial was a "discretionary" action for our review. Accordingly, we decline to further address the argument. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (this court may decline to address arguments that are unsupported by legal authority and undeveloped).

**CONCLUSION**

¶24     In summary, we conclude that the prosecutor's conduct in eliciting allegedly false testimony showing that Spence denied knowing Rastar Shipp, and in emphasizing that denial in closing argument, if error, was harmless. It is clear

---

[3] In reliance on *State v. Harp*, 161 Wis. 2d 773, 775, 469 N.W.2d 210 (Ct. App. 1991), Spence argues that this court has broad discretion to order a new trial where there has been a miscarriage of justice, regardless of the type of error involved and without any showing as to the likelihood of a different result on retrial. Spence's reliance on *Harp* is misplaced. In *Harp*, this court noted that the "interest of justice" standard in WIS. STAT. § 805.15(1) provides circuit courts with the discretion "to set aside a verdict and order a new trial in cases where the real controversy was not fully tried, regardless of the type of error involved and, further, that the court need not find a substantial likelihood of a different result on retrial before doing so." *Harp*, 161 Wis. 2d at 775. *Harp* does not alter the law set forth in *Vollmer v. Luety*, 156 Wis. 2d 1, 19-22, 456 N.W.2d 797 (1990), described above, in which we stated that, in cases in which a party alleges that there has been a miscarriage of justice under WIS. STAT. § 752.35, "an appellate court must first make a finding of substantial probability of a different result on retrial."

beyond a reasonable doubt that a rational jury, viewing all the evidence under the totality of the circumstances, would have found Spence guilty absent any such error.

¶25    Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.